**In the United States District Court
for the District of Kansas**

————————

Case No. 24-cr-40030-TC-1

————————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

JAIQUAN JAHAI WHEELER,

*Defendant*

————————

## MEMORANDUM AND ORDER

Jaiquan J. Wheeler is charged with two counts of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Doc. 19. He moves to suppress three firearms, one seized during a traffic stop and two seized from his residence. Doc. 17. For the following reasons, Wheeler's motion is denied.

### I

### A

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007). A warrantless

stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020).

"Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Glover*, 589 U.S. at 380 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. at 417). The emphasis is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While a mere "hunch" is not enough, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (quotation marks omitted).

The analysis is an objective one. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404–05 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (emphasis in original). The officer's subjective motivation is irrelevant. *Id.*; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."). That said, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *Arvizu*, 534 U.S. at 273.

## B

In the early morning hours of November 30, 2023, Topeka Police Department Officer James Sexton was patrolling in Topeka, Kansas, around Ripley Park. Doc. 17 at 1.[1] Sexton observed a white Dodge Charger and a silver Chevrolet Malibu traveling at what he described as bumper-to-bumper distance and at a high rate of speed on Branner

---

[1] All document citations are to the document and page number assigned in the CM/ECF system.

Street.[2] Because this was a high crime area and it was unusual to see any traffic at that time of the night, the two cars drew Sexton's attention. The Charger turned eastbound onto Third Street at such a speed that it continued to intrigue Sexton, so he cut off the Malibu and began to follow the Charger. The Charger then turned onto Klein Street and engaged its turn signal as it made the turn, rather than 100 feet before making the turn as required by Kansas law. Sexton then pulled over the Charger.

Once he approached the Charger, Sexton noticed a strong odor of marijuana emanating from it. There were five individuals inside the vehicle. Wheeler was sitting behind the driver's seat. The driver was confrontational, so Sexton asked him to exit the car. Soon thereafter, other police officers arrived, and Sexton handed the driver off to them. Sexton then asked the front passenger, Brian Wright, to exit the vehicle. But when Wright exited, he began to flee on foot. Sexton gave chase, ultimately detaining Wright some distance away from the site of the traffic stop. He searched Wright and found a gun and a bag of marijuana on him. Sexton then returned to the stopped vehicle where the other officers and occupants remained.

While Sexton was away, other officers had secured and evacuated the vehicle. Officer Devin Veer had searched the vehicle and found a stainless steel revolver in the floorboard under a black microfiber cloth where Wheeler was sitting behind the driver's seat. Veer told Sexton that he believed a black cloth fell out of the vehicle as Wheeler stepped out. But as it turned out, the cloth had actually fallen out when a different passenger stepped out of the car. And subsequent testing later confirmed that DNA located on the revolver matched Wheeler's DNA profile. Doc. 17 at 3.

The grand jury indicted Wheeler for one count of unlawfully possessing the stainless steel revolver found as a result of the traffic stop. Doc. 1. (charging a violation of 18 U.S.C. § 922(g)(1)). Then, when FBI agents arrested Wheeler at his residence, United States Probation Officers conducted a search of Wheeler's residence and found two

---

[2] The following facts were found based on the witnesses' testimony at the suppression hearing.

additional handguns and ammunition.[3] The grand jury then issued a superseding indictment charging Wheeler with another count of unlawful possession of the two firearms. Doc. 19 (charging two counts of violating of 18 U.S.C. § 922(g)(1)).

Wheeler now moves to suppress the three firearms. Doc. 17. He argues that the stainless steel revolver should be suppressed because "Officer Sexton did not have a lawful basis to stop the car," and therefore "Wheeler was unlawfully seized." *Id.* at 4. And he argues that the two guns the probation officers found at his residence should also be suppressed given that "[t]he search of Mr. Wheeler's residence was unlawful because it was conducted as a direct result of the illegal action carried out by Officer Sexton." *Id.* at 5. A suppression hearing was held on October 24, 2024, and Wheeler's motion is now ripe for decision.

## II

The totality of the evidence establishes that Sexton had reasonable suspicion to initiate a stop based on his testimony that the vehicle engaged in a violation of Kansas's traffic laws. But even if the stop was unlawful, Wheeler has not established a factual nexus between his detention and the seizure of the revolver. Accordingly, Wheeler's motion is denied.

## A

Wheeler argues that Sexton had no reasonable suspicion to pull over the Charger because "the driver of the vehicle properly used his turn signal." Doc. 17 at 4. He maintains that two witnesses confirm that the driver properly signaled a turn. *Id.* And he notes that "false statements contained in [Sexton's probable cause affidavit] as well as the intentional omission of important other facts convey some other motive for Officer Sexton's vehicle stop that evening." *Id.* In essence, Wheeler seeks a credibility determination concerning whether the vehicle engaged its blinker before or during the turn.

Based on the totality of the evidence presented at the hearing, it appears likely that Sexton observed a violation of Kansas's traffic laws

---

[3] Wheeler was on supervised release and subject to a search condition. *See United States v. Wheeler*, Case No. 22-40041, Doc. 40 (describing the alleged violations, including the arrest and discovery of weapons during the search).

4

that justified the traffic stop. As a result, the stop was supported by reasonable suspicion.

Sexton credibly testified that he was behind the Charger when the driver engaged the blinker while—and not 100 feet before—making a turn. That violates Kansas law. *See* K.S.A. § 8-1548(b) ("A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning."); *State v Greever*, 183 P.3d 788, 797 (Kan. 2008) ("The plain language of K.S.A. 8-1548 provides that anyone turning a vehicle must provide an appropriate signal—namely, a turn signal given continuously for at least 100 feet before the turn.") (quotation marks omitted). Sexton acknowledged that it is difficult to determine whether a vehicle travelling is, for example, 100 feet, 50 feet, or closer to the turn. As a result, he only stops vehicles for this infraction if he is certain—as he was here—that there was no turn signal used until the turn was being executed.

Wheeler's arguments to the contrary do not tilt the scale in his favor. He first points to the testimony of one of the occupants of the stopped Charger, Robert Reyes. Reyes testified at the suppression hearing that he believed the driver, whose identity was not provided but is apparently known as "Pedro" or "Echo," engaged his signal at least 100 feet before making the turn because Pedro is known by Reyes to be a cautious driver, and that he believed the turn signal was still on during the video-taped encounter of the traffic stop.[4] That testimony was neither helpful nor credible. For one thing, even assuming Pedro is a safe driver and attempted to timely engage the turn signal, Reyes, as a passenger in the vehicle, could not have seen whether the exterior signals were working at the time. Only Sexton testified to this point, and he said it was not visible until after the turn. Moreover, contrary to Reyes's recollection, the video confirms—as Reyes conceded upon cross-examination—that the turn signal was not still activated during the stop as he believed. Wheeler points to no other evidence or testimony. Accordingly, the totality of the circumstances supports the conclusion that Sexton had reasonable suspicion to initiate the traffic stop. *See United States v. Burkley*, 513 F.3d 1183, 1187 (10th Cir. 2008) (affirming the district court's finding of reasonable suspicion when the

---

[4] There was no video recording of the events leading up to the traffic stop. Sexton's body-worn camera began recording at or near the time that he exited his patrol vehicle and approached the Charger.

officer was "directly behind" the defendant, who did not properly signal a turn); *see also United States v. Woods*, 351 F. App'x 259, 262 (10th Cir. 2009) (finding that the district court's crediting of the officer's testimony that the defendant failed to signal within 100 feet of a turn in violation of Kansas law was not clearly erroneous).

Wheeler's attempt to impugn Sexton's credibility by pointing to alleged errors in the post-arrest report and/or probable cause affidavits is not persuasive. *Contra* Doc. 17 at 3–4. District courts are required to assess the credibility of witnesses and determine the weight to be given the evidence presented. *United States v. Nance*, No. 24-40017, 2024 WL 3179684, at *1 n.2 (D. Kan. June 26, 2024) (citing *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020)). The evidence and testimony presented at the suppression hearing undermined the alleged falsity that Wheeler proposed and explained away the discrepancies that Wheeler championed. For example, Wheeler's chief complaint appears to be that Sexton's report falsely indicated a black cloth had fallen out of a particular side of the car when Wheeler stepped out of the vehicle, thus incorrectly connecting Wheeler to the firearm. Doc. 17 at 3. But Sexton's testimony explained that he was simply repeating in his report what another officer had told him occurred while he was away from the scene chasing Wright, and acknowledged that the videotaped encounter contradicted that officer's statement. Nothing about those circumstances undermines Sexton's credibility concerning whether he saw the vehicle fail to appropriately use its turn signal.

## B

But even if the stop of the Charger was unlawful, suppression is unwarranted. Wheeler, a passenger in that vehicle, has not shown a factual nexus between his detention and the seizure of the stainless steel revolver.

Fourth Amendment rights are personal, so "a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." *United States v. Mosley*, 743 F.3d 1317, 1322 (10th Cir. 2014) (quoting *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001)). In other words, a passenger who lacks a possessory or property interest in a vehicle cannot directly challenge the vehicle's search following an unlawful stop. *United States v. Elicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995). The passenger can only "contest the lawfulness of his own detention and seek to suppress

evidence found in the vehicle as the fruit of [his] illegal detention." *DeLuca*, 269 F.3d at 1132.

The Tenth Circuit imposes a burden on a passenger to obtain suppression of evidence from an illegal detention. *DeLuca*, 269 F.3d at 1132. That standard requires a passenger to establish that the detention violated his or her Fourth Amendment rights and that that there is a factual nexus between the illegality and the challenged evidence. *DeLuca*, 269 F.3d at 1132 (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)). To demonstrate a factual nexus, the passenger must "at a minimum . . . adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Id.* That is, the defendant must show that "had he requested to leave the scene of the traffic stop, he would have been able to do so in [the vehicle]." *Id.* at 1133. This means the passenger must show that the evidence would never have been found "but for" the passenger's unlawful detention. *Id.*

Wheeler has failed to meet that burden. In fact, Sexton testified at the suppression hearing that police would not have released Wheeler and allowed him to leave with the Charger. That testimony is confirmed based on the totality of the circumstances leading to the stop and the subsequent encounter between the occupants of the vehicle and the officers. Indeed, Wheeler presented no evidence at the suppression hearing or argument showing that, had he requested to leave the scene of the traffic stop, he would have been able to do so in the Charger. That dooms his claim. *See DeLuca*, 269 F.3d at 1133 (noting that when the defendant does not offer this evidence, the court must assume that, regardless of the defendant's presence, "the car and its owner would have continued to be detained and the officer would still have found the [evidence]").

The inquiry does not focus on the (alleged) illegality of the stop in the first instance. *Contra* Doc. 22 at 2 (arguing that "[t]here is no question that the discovery of the firearm in the Dodge Charger was a 'but for' result of the unlawful stop" because "[h]ad the Charger and its occupants not been stopped, the firearm in the vehicle would not have been discovered"). The analysis is not whether the initial unlawful stop was a but-for cause of the revolver's discovery, but rather whether Wheeler's unlawful detention after the stop was. Even if the officers had allowed Wheeler to walk away from the scene, they would have still found the firearm in the vehicle that they stopped. As a result,

Wheeler's detention at the scene was not the but-for cause of discovering the gun within the car. *DeLuca*, 269 F.3d at 1133 (explaining by way of a hypothetical that even if the officers had allowed the passenger to leave the scene, they would still have found the evidence because it was in a vehicle owned by the driver "who was not going anywhere until his vehicle had been searched").

Wheeler claims the *DeLuca* test is inapplicable because it arose in a circumstance where the traffic stop was legal at its inception and only became illegal later.[5] Doc. 22 at 3. In his case, Wheeler continues, the stop was illegal at its inception so any evidence seized after the illegal stop should be suppressed. *Id.* (pointing to the Third Circuit's analysis in *United States v. Mosley*, 454 F.3d 249 (3rd Cir. 2006), where that court found that *DeLuca* is "relevant only to situations in which the initial traffic stop is legal").

There are at least two reasons to reject Wheeler's position. One is because he relies on a false premise: The stop in this case was lawful at its inception and at no point became unlawful. *See* Part II.A., *supra*. As a result, even he must concede that *De Luca* controls. *See United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023) (describing vertical stare decisis), *cert denied*, 144 S. Ct. 1035 (2004). The other is that the Tenth

---

[5] There is discord among the circuits on this issue. *See generally* Nadia B. Soree, The Hitchhiker's Guide To The Fourth Amendment: The Plight Of Unreasonably Seized Passengers Under The Heightened Factual Nexus Approach To Exclusion, 51 AM. CRIM. L. REV. 601 (2014). For one, the *DeLuca* opinion has been strongly criticized by judges, including within the Tenth Circuit and beyond, and respected scholars. *See DeLuca*, 269 F.3d at 1135 (Seymour, J., dissenting); *United States v. Pulliam*, 405 F.3d 782, 791 (9th Cir. 2005) (Wardlaw, J., dissenting); *see also* 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.4(d) (6th ed.) (calling *DeLuca* "ludicrous"). And at least one circuit has applied a different approach. *See United States v. Jones*, 234 F.3d 234, 244 (5th Cir. 2000) (quoting *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998)) (employing the test that "all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation") (*abrogated on other grounds by United States v. Pack*, 612 F.3d 341 (5th Cir. 2010)); *see also United States v. Fraguela-Casanova*, 858 F. Supp. 2d 432, 449–51 (M.D. Pa. 2012) (laying out the two main tests but choosing to follow the Third Circuit's analysis in *United States v. Mosley*, 454 F.3d 249 (3rd Cir. 2006)).

Circuit, despite criticism, has suggested that *DeLuca* applies even if the stop was illegal. *See United States v. Mosley*, 743 F.3d 1317, 1323 n.1 (10th Cir. 2014) (noting that *DeLuca* "nowhere cabins its test to lawful vehicle seizures that later become unlawful detentions."); *see also United States v. Hampton*, 374 F. Supp. 3d 1115 (D. Kan. 2019) (following *DeLuca* even if the detention was unlawful). Therefore, federal district courts in Kansas are bound by principles of stare decisis to apply the law as stated by the Supreme Court and the Tenth Circuit. *Spedalieri*, 910 F.2d at 709 n.2 ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."); *Hutto v. Davis*, 454 U.S. 370, 375 ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").

## C

The two handguns that probation officers found at Wheeler's home are not fruit of the poisonous tree. Wheeler's sole argument on this point is that his arrest on May 23, which led to the discovery of the two handguns, "was based solely on unlawfully obtained evidence from an unlawful stop and, therefore, cannot form the basis for any lawful search." Doc. 22 at 4. But as noted above, the traffic stop on November 30 was not unlawful because Sexton had reasonable suspicion to suspect that the Charger committed a traffic violation. *See* Part II.A. *supra*. And even if the stop was unlawful, police did not unlawfully obtain the stainless steel revolver because there is no factual nexus between Wheeler's detention and the discovery of the revolver. *See* Part II.B. *supra*. The federal agents serving the warrant were authorized to arrest Wheeler, including within his home. See *United States v. Hutchinson*, 573 F.3d 1011, 1023 (10th Cir. 2009) (citing *Payton v. New York*, 445 U.S. 573, 596–97 (1980)) (noting that law enforcement may enter a home to execute an arrest warrant when they have reasonable belief that the arrestee lives at the residence and is currently in the residence at the time of entry).

Moreover, the conditions of Wheeler's supervised release were such that probation officers were also lawfully present. Wheeler, previously convicted in D. Kan. Case No. 22-40041, was on supervised release at the time the federal agents served the arrest warrant. *See Wheeler*, No. 22-40041, Doc. 20 at 4 (prohibiting Wheeler from possessing firearms). Part of his conditions of supervision specified that Wheeler must allow probation officers to visit his home at any time to

take any prohibited items that were in plain view, and probation officers could search his home if they had reasonable suspicion that he violated a condition of his supervision. *Wheeler*, No. 22-40041, Doc. 20 at 4–5. Given the indictment and arrest warrant, the probation officers had more than reasonable suspicion that Wheeler violated a condition of his release by possessing a firearm. This allowed them to search Wheeler's home at the time the federal agents served the arrest warrant. Accordingly, the officers found the two handguns subject to a lawful search of Wheeler's home. *See United States v. Ramon*, No. 22-1249, 2023 WL 6939693, at *3 (10th Cir. 2023) *cert. denied*, 144 S. Ct. 1040 (2024) (finding that a warrantless search was lawful because officers had reasonable suspicion to believe that the defendant possessed drugs, which was a violation of the conditions of his supervised release).

### III

For the foregoing reasons, Wheeler's Motion to Suppress, Doc. 17, is DENIED.

It is so ordered.

Date: November 20, 2024          _s/ Toby Crouse_____
                                  Toby Crouse
                                  United States District Judge